O’NIELL, J.
This is an appeal from a. judgment in favor of plaintiff for $7,500 damages for personal injuries. An automoDile in which he was crossing a railroad track was struck by the rear end of a freight train, which ran over him, and so mangled his leg that it had to be amputated below the knee.
The suit was brought first against the railway company, and judgment was prayed for against the receiver as such.
Subsequently, pursuant to General Order No. 50, issued by William G. McAdoo, Director General of Railroads, and the similar General Order No. 50-A, issued by his successor, Walker D. Hines, Director General of Railroads, plaintiff filed a supplemental petition, praying that the Director General should be made defendant and cited as such, and that, if the court should hold that the receiver of the railway company was not the proper party defendant, judgment should be rendered against the Director General. The railway company then appeared, through its receiver, and filed an exception to the suit against the railway company or the receiver, averring that, in consequence of the general orders referred to, plaintiff had no right of action against the railway company, and praying that the suit against the railway company should be dismissed. The exception or motion was sustained, and the suit against the railway company was dismissed, leaving the Director General of Railroads ás the only party defendant in the suit. Plaintiff reserved a bill of exceptions to the ruling, the benefit of which exception was expressly reserved by the court in the decree rendered against the Director General of Railroads. The latter was represented by the same attorneys who had appeared for the railway company and the receiver. The Director General of Railroads appealed from the judgment rendered after trial of the case on its merits; and plaintiff then appealed from the judgment, dismissing the suit against the railway company and the receiver. Plaintiff has also answered the appeal of the Director General of Railroads, and prays that the amount of the judgment be increased to $15,000.
[1] The attorneys representing both the Director General of Railroads and the receiver of the railway company, of course, do not insist that the case should be remanded for trial against the railway company .or the receiver. Nor do the attorneys for plaintiff demand that the case should be remanded for that purpose. Their appeal from the judgment dismissing the suit against the railway company or the receiver and maintaining it against the Director General of Railroads seems to have been only a safe precaution against what might be the consequence of a ruling that the Director General of Railroads was not a proper party defendant in the case. On the contrary, under the general orders referred to, it appears that the Director General of Railroads was the. proper party to defend the suit for the railway company. Judgments, in such cases, as we understand, are paid by appropriations which have been made by the Congress of the United States.
[2] In other respects, the case presents only questions of fact. Plaintiff and five other soldiers were riding in a seven-passenger hired automobile, driven by a hired chauffeur, returning from Hotwell, a pleasure resort, to the city of Alexandria. The collision occurred on the railroad crossing on Monroe street, a wide paved street entering the city of Alexandria, which is crossed by the railroad track at right angles. It was near midnight when the automobile came to the railroad. The crossing had been pro *1053 tected by gates or barriers, with red lights on them, one on each side of the track, which were lowered as a warning of danger when a train was crossing, or about to cross, the street. The gates had been operated by a flagman in a tower situated between the two tracks and near Monroe street. The gates however, were out of commission, and were left open on the night of the accident, one of them having been demolished by a fire engine on the day before the accident. The flagman was therefore stationed at the crossing, with a red lantern in one hand and a bright lantern in the other, to give warning in case of danger to any person approaching the railroad track. The train foreman, with a bright lantern in his hand, was also near the crossing, in conversation with the flagman, when the automobile approached. A train of eight empty box cars was standing on the track, one end of the train being near Monroe street. The foreman was waiting for the locomotive to come out of a siding at the other end of the train, after which he was to signal the engineer to back up and shove the train across Monroe street. The engineer, of course, was in the locomotive cab, and there was a switchman on the running board. The engineer and switchman were therefore at a distance exceeding eight car lengths from Monroe street. The foreman and flagman and the engineer and switch-man testified that they saw the lights on the automobile approaching the crossing when it was about 100 yards away, and that it was coming at a very high speed, about 40 miles an hour. At that moment, perhaps immediately after seeing the automobile lights, the foreman signaled the engineer to back up, and the train moved slowly towards the crossing. The foreman and flagman testified that they then immediately signaled to the men in the automobile to stop their car, but that the car continued towards them, notwithstanding their frantic efforts to flag the chauffeur with their lanterns, until'the automobile got upon the crossing and was struck by the rear end of the freight train. The foreman and flagman also testified that .when they realized that the driver of the automobile would not stop, they signaled to tlie engineer-’ to stop his train, and that he did stop immediately. It appears that the slack of the train caused the rear car to move some distance after the locomotive had stopped. The engineer testified that he realized that the driver of the automobile was not heeding the signals of the foreman and flagman, and that he, the engineer, applied his brakes an instant before the foreman or the flagman signaled him to stop. The automobile was shoved several feet down the track a distance estimated at from 4 to 8 feet. Some of the occupants of the automobile remained in the car and were not injured. All who jumped out landed in places of safety, excepting plaintiff. He was riding on the front seat, with the chauffeur on his left and another man on his right. When he had arisen to jump, and before the man on his right could get out of his way, the impact of the train caused him to fall immediately in front of the moving box car.
[3] Plaintiff and the chauffeur and four other occupants of the automobile testified that they did not see the foreman or the flagman or any light at the crossing until it was too late to avoid the accident. They testified that the automobile approached the crossing at a moderate speed until they were about 100 yards from the railroad track. The chauffeur was familiar with the situation, and was depending upon the gates and lights supposed to be thereon, to warn him of danger. The other occupants of the car were not familiar with the situation. They had left Alexandria by another route that afternoon. The chauffeur and five of the six soldiers testified that, when the automobile was about a hundred yards from the *1055 railroad crossing, the chauffeur reduced his speed and blew his horn, and that the car continued to slow down until it was within a very few feet from the track. Observing that the gates were open, and seeing no lights or other signal of danger, and not observing the freight train moving in the darkness, the chauffeur shifted his gear from high to second speed to go over the railroad track. These witnesses testified that, at that instant, they observed the rear end of the freight train approaching, and an instant later the foreman or flagman dashed out immediately in front of the automobile, waving his lantern. They testified that it was then too late to stop the automobile in time to avoid the accident, but that the chauffeur might have cleared the track ahead of the train if the foreman or flagman had not stopped them or got in their way. It is admitted that there was no light or lookout on the rear end of the freight train. The flagman and the three members of the train crew testified that the engineer sounded his whistle immediately before he started to back up; but the chauffeur and the five soldiers who testified in the case swore that they did not hear the whistle. That may easily be accounted for by the fact that the locomotive was more than eight car lengths away from the crossing, and the attention of the occupants of the automobile was directed at the crossing, the chauffeur having his mind upon seeing whether the gates were open or closed. The blowing of the whistle, more than eight car lengths away, was not a sufficient warning of danger at the crossing.
The decision of this ease seems to have turned upon the question whether the flagman and the train foreman were stationed where the flagman should have been, to make it almost, if not quite, impossible for any one approaching the railroad track to be deceived by the fact that the gates were open. The foreman and the flagman both testified that they were in that position, and that the occupants of the automobile refused to heed their warnings. Their testimony, in that respect, is corroborated by that of the engineer on the •locomotive; but he was so far away from the scene of the accident that we do not believe it was possible for him to know exactly where the train foreman and the flagman were standing. Unless the plaintiff and his five witnesses testified to a deliberate falsehood, the foreman and flagman were not in a position where their lanterns could be seen from the automobile in time to prevent the accident. Being engaged in conversation, it is not improbable that the flagman and the foreman forgot for the moment that the barriers or gates were open; for the duty which the flagman was then required to perform was not ordinarily his, and was never the foreman’s duty. In fact, unless the plaintiff and his five witnesses testified to a deliberate falsehood, the train foreman and the flagman were not where the flagman should have been, and their lanterns were not observed by the occupants of the automobile, because the men with the lanterns were either behind'the end of the freight train or behind the little house usually occupied by the flagman, on the sidewalk, between the railroad track and the automobile. Be that as it may, the district judge found that there was a preponderance of evidence in support of plaintiff’s contention that the warning of danger was not given in time to prevent the accident; and we find no reason for a reversal of the judge’s conclusion in that respect.
The fact that one of the six soldiers who were riding in the automobile did not testify in the case is accounted for by the fact that he was sent away from Camp Beauregard soon after the accident, and was said to be in Germany at the time of the trial.
. [4] The amount of the judgment appealed from is the same that has been allowed for *1057 similar injuries in several recent eases. See Cross v. Lee Lumber Co., 130 La. 66, 57 South. 631, Bell v. Houston & Shreveport Railroad Co., 132 La. 88, 60 South. 1029, 43 L. R. A. (N. S.) 740, Miley v. Louisiana Sawmill Co., 141 La. 484, 75 South. 214, and Adams v. Bollinger & Co., 141 La. 494, 75 South. 218.
The judgment appealed from is affirmed, at appellant’s cost.
On Motion To Amend Decree.
PER CURIAM.
On the joint motion of counsel for both plaintiff and defendant herein, and upon their' suggesting that Janies C. Davis has succeeded Walker D. Hines as Director General of Railroads and Federal Agent under the Transportation Act (41 Stat. 456).
It is ordered ’that James C. Davis, Director General of Railroads and Federal Agent under the Transportation Act, be substituted as the party defendant herein; and the judgment herein rendered and affirmed is now therefore rendered against James C. Davis in his aforesaid official capacity.